IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2007 JAN 10 P 1: 02

CLERK
SO. DIST. OF GA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 106-081 |
| | ) | |
| ALVIN L. PRICE | ) | |
| DONALD M. REYNOLDS | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has accused Defendant Donald

M. Reynolds ("Reynolds") of violating 18 U.S.C. §§ 2113(a) and 2113(d) by taking a sum

of money by force, violence and intimidation from a bank whose deposits, at the time of the

alleged robbery, were insured by the Federal Deposit Insurance Corporation, and in doing

so, allegedly assaulting and putting in jeopardy the life of other persons by the use of a

dangerous weapon, that is a firearm.  The matter is now before the Court on Reynolds's

motions to suppress all physical evidence seized on April 21, 2006, as a result of an allegedly

improper traffic stop, as well as any fruits of the traffic stop; Reynolds also moves for the

suppression of all pre-trial identification testimony related to the "show-up" identification

conducted at the Queensboro National Bank on April 21, 2006.[1]  The Court held an

evidentiary hearing on the matter, at which time the Court heard testimony from Deputy

_____

[1]Defendant Alvin L. Price ("Price") had filed his own motion to suppress, but at the December 20, 2006 hearing, he appeared, with counsel, and waived his right to participate in the hearing because he had decided to enter a guilty plea.  Thus, Defendant Price abandoned his motion to suppress, and the Court **REPORTS** and **RECOMMENDS** that it be **DENIED** as **MOOT**.  (Doc. no. 48).

Steven An with the Richmond County Sheriff's Office ("Deputy An"), as well as argument

from Assistant United States Attorney Jay Weimer and Reynolds's defense counsel, Davis

Dunaway.[2]  Now, for the reasons developed more fully herein, the Court **REPORTS** and

**RECOMMENDS** that Reynolds's motions to suppress be **DENIED**.  (Doc. nos. 45, 74).

## I.    FACTS

The Queensboro National Bank in Hephzibah, Georgia was robbed on April 21, 2006.

At approximately 9:15 or 9:20 a.m. that day, an emergency tone went out across Deputy An's

police radio indicating that an armed robbery had occurred at a bank on Tobacco Road.

(Prelim./Det. Hr'g Tr., doc. no. 72, p. 38).[3]  Approximately five to ten minutes later, dispatch

gave a description of a possible getaway car as "an older model blue Chevy Corsica with a

possible rust spot and that the [civilian] caller was possibly following the getaway car." (Id.).

At that time, the last reported location of the Corsica was Deans Bridge Road and

Meadowbrook Drive, traveling northbound.  (Id.).  When Deputy An heard this getaway

vehicle description, he was traveling southbound, approaching Deans Bridge Road and

Georgetown Drive, and when he asked dispatch for a last known location of the vehicle, he

---

[2]As the Court held an evidentiary hearing on December 20, 2006, the request for a hearing on the motion to suppress is now moot, and the Clerk is **DIRECTED** to terminate that portion of the motion from the motions report.  (Doc. no. 74-2).

[3]Although the December 20, 2006 evidentiary hearing was recorded and a transcript has been requested, the transcript was not available at the time this recommendation was prepared.  Thus, for ease of reference, where there is no dispute between the facts as testified to at the preliminary/detention hearing and the December 20th hearing, the Court will cite to the transcript from the preliminary/detention hearing.

was told, "Ready to approach Georgetown."[4]  (Id. at 38-39).  The deputy looked to the left

opposite lane and saw a blue Corsica that he thought "kind of matched" the description.  (Id.

at 39).  On a self-described "hunch," Deputy An decided to attempt to stop the Corsica.  (Id.

at 42, 45, 48).

Deputy An turned on his blue lights, turned left toward the median, jumped the

median, and made eye contact with Price, the driver.  (Id. at 39).  As the deputy's car was "T-

bone" to the driver's side of the Corsica, Reynolds popped up from the back seat and fired

a shotgun at Deputy An.[5]  (Id.).  Deputy An explained that he had not had time to pull up

behind the Corsica (he was attempting a U-turn) before Reynolds fired the shotgun and that

the Corsica was initially coming to a stop in the northbound lane because of traffic.  (Id. at

39, 46, 51).  After Reynolds fired, Deputy An exited his vehicle to take cover and return fire.

(Id. at 39).  By then, the traffic began to clear, and Price drove the Corsica forward into a gas

station to let Reynolds out.  (Id. at 39, 47).  Reynolds fled on foot, and Deputy An chased

him for approximately five to seven minutes on foot before apprehending him.[6]  (Id. at 39-

40).  Price was eventually arrested by other law enforcement officers.  (Id. at 40, 50).  After

the arrests, law enforcement officers searched the Corsica and recovered a black wig, gloves,

and coveralls that had been used in the bank robbery, as well as a wallet taken from an

---

[4]The location of Georgetown and Deans Bridge Road is approximately two to three
miles from the Queensboro National Bank that had been robbed.  (Doc. no. 72, p. 42).

[5]Deputy An testified at the December 20th hearing that when he had completed his
"T-bone" maneuver, the front of his car was approximately five feet or less away from the
Corsica, but he did not place his car in park until Reynolds fired the shotgun.

[6]At the December 20th hearing, Deputy An estimated the foot chase to have lasted
five to ten minutes.

individual at the bank, the money that had been taken from the bank (approximately $6,700), a 12 gauge shotgun, along with some spent shotgun shell casings, two cell phones, and a pawn receipt from a pawn shop in Charlotte, North Carolina. (Id. at 6-9, 24).

After Reynolds was arrested at around 10:00 a.m., approximately one hour after the bank robbery occurred, he was transported back to the Queensboro National Bank for a show-up identification. (Id. at 25). At the December 20th hearing, Deputy An testified that he transported Reynolds in the rear seat of his law enforcement vehicle back to the bank and that he was accompanied by one or perhaps two other law enforcement officers. Reynolds arrived back at the bank in handcuffs and wearing a blue shirt and dark pants, the clothes in which he had been arrested. Deputy An opened the back door of the vehicle and stood Reynolds up - next to the law enforcement vehicle - for the show-up, which lasted about one minute. Deputy An further testified that he did not say anything to Reynolds or position him in any particular way during the show-up, but he did remain next to Reynolds for security purposes.[7] Reynolds stood approximately fifteen to twenty feet away from the witnesses, located inside the bank, for the show-up. Deputy An candidly admitted that he had no information about what went on inside the bank once he arrived with Reynolds, and thus, he could offer no information about any communications that may have occurred with the bank

---

[7]When asked by defense counsel, Deputy An could not recall asking Reynolds to raise his head.

employee witnesses during the show-up.[8]   Once the show-up was over, Deputy An immediately left with Reynolds and took him to the jail at 401 Walton Way in Augusta, Georgia.

## II.    DISCUSSION

### A.    Legality of the Search of the Blue Corsica

Reynolds first argues that Deputy An improperly stopped the blue Corsica in which he and Price were traveling on April 21, 2006, because Deputy An testified at the preliminary/detention hearing that he stopped the vehicle on a "hunch" rather than on a reasonable suspicion that would justify an investigative stop.  The government counters that Deputy An did not effect a traffic stop because the vehicle stopped as a result of the normal flow of traffic, not in response to a show of authority by Deputy An.  The government also makes the alternative arguments that (1) even if Deputy An stopped the vehicle, the stop was based on reasonable suspicion, and (2) even if the vehicle was improperly stopped, when Reynolds fired a shotgun at Deputy An, he committed a new, distinct crime that authorized law enforcement officers to arrest Reynolds and then search the vehicle incident to such an arrest.  The government has the better arguments.

---

[8]Notably, at the preliminary/detention hearing, the Court heard testimony from Special Agent Randy Beach with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("Special Agent Beach"), who was "in the bank and around the outside" after the robbery occurred (doc. no. 72, p. 26), about Reynolds opening his mouth and perhaps having been asked to smile during the show-up (id. at 12, 26).  Thus, although Special Agent Beach "did not stand right there and participate in the show-up," (id. at 26), he was able to offer testimony about the show-up that augments Deputy An's testimony about what went on outside the bank during the show-up and that offers further insight on defense counsel's explanation of what he learned about the show-up procedure when interviewing the bank employees (see Part IIB, infra).

1.    **Deputy An Did Not Effectuate a "Traffic Stop" in Intersection.**

First, the facts establish that Deputy An did not effectuate a "traffic stop" when, acting upon the information from dispatch concerning the location of the suspected getaway vehicle, he turned on his blue lights, attempted a U-turn, and ended up "T-bone" to Reynolds's vehicle.  For the purposes of Fourth Amendment analysis, a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). The Eleventh Circuit has further explained that, a person is "seized" when "a reasonable person would [not] feel free to terminate the encounter" with the police. Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006).  This "free to leave" test considers several factors, including, *inter alia*, whether a citizen's path is blocked or impeded, the display of weapons, and any physical touching of the suspect. Id. Employing this test, the Eleventh Circuit has ruled that the initiation of police lights and placement of a police vehicle behind a subject's vehicle does not necessarily exhibit coercion that would make the subject feel that he was not free to leave; thus, the analysis of whether a subject was detained or seized must take into consideration the totality of the circumstances of a police encounter.  Id. at 1257-58. Notably, however, the Supreme Court has ruled that absent physical force, a seizure does not occur if the subject does not yield to a show of authority. California v. Hodari D, 499 U.S. 621, 625-26 (1991).

Here, examining all of the circumstances of the encounter between Deputy An and Reynolds in the intersection, the Court concludes that Deputy An did not effectuate a "traffic stop" or otherwise "seize" Reynolds for the purpose of Fourth Amendment analysis.  The

6

undisputed testimony from Deputy An was that when he saw the blue Corsica resembling the reported getaway vehicle at the intersection where the vehicle had been reported to be by a civilian following the vehicle, he turned on his blue lights (alerting surrounding vehicles to his intention to cross traffic), turned left toward the median, jumped the median, and made eye contact with Price. (Doc. no. 72, p. 39). Although the deputy had activated his blue lights prior to performing his "T-bone" maneuver, [9] he had not blocked the Corsica's path or otherwise used physical force or coercion to restrict the movement of the Corsica or Reynolds. In fact, the only testimony of record is that the Corsica stopped when Deputy An arrived "T-bone" to the vehicle because of on-coming traffic at the intersection (id. at 39, 46, 51), not because of any actions taken by Deputy An.[10]

---

[9] Deputy An testified at the December 20th hearing that his car was approximately five feet or less away from the blue Corsica at the time his vehicle was "T-bone" to the Corsica.

[10] Defense counsel argued at the evidentiary hearing that under United States v. Beck, 602 F.2d 726 (5th Cir. 1979), restraint of movement by law enforcement amounts to a seizure, and thus, when Deputy An pulled "T-bone" to the Corsica in the intersection, he effectuated a seizure. The Court disagrees. In Beck, the Eleventh Circuit considered a factual scenario in which a patrol car had pulled alongside a parked vehicle and ruled, "By pulling so close to the Chevrolet, the officers effectively restrained the movement of Beck and his passenger; from the record it is readily apparent that they were " 'not free to ignore the officer(s) and proceed on (their) way.' " Beck, 602 F.2d at 729 (citations omitted). Here, however, Deputy An pulled "T-bone" to the Corsica which had come to a stop - not parked- because of traffic. Moreover, as Price drove the Corsica forward once the traffic cleared the intersection, Reynolds and Price were clearly not restrained by the positioning of Deputy An's vehicle.

In any event, as discussed in the next section, even if Deputy An had successfully stopped the Corsica for further investigation, there is still no cause to find a Fourth Amendment violation because Deputy An possessed the requisite reasonable suspicion to investigate.

Moreover, once Deputy An pulled "T-bone" to the Corsica (he was attempting a U-turn, but he, like Reynolds in the Corsica, was hampered by traffic and could not get behind the getaway car), Reynolds popped up in the back seat and shot at the deputy (id. at 39), clearly providing justification not just for a stop, but for an arrest. However, once Deputy An exited his vehicle to take cover and return fire, the traffic flow changed such that the Corsica could, and did, move off into the parking lot of a convenience store, where Reynolds proceeded to exit the Corsica and flee on foot. (Id. at 39-40). There was no submission to any possible show of authority resulting from Deputy An positioning his vehicle "T-bone" to the Corsica, and the ability of the Corsica (or its passengers) to move was not restricted by action taken by Deputy An. To the contrary, Reynolds fired on Deputy An and the Corsica then fled the intersection. Reynolds offered no testimony, by witness or affidavit, to contradict Deputy An's fully credible description of events leading up to his initial encounter with Reynolds in the intersection, and the Court concludes that Deputy An did not effectuate a "traffic stop" or "seizure" of Reynolds.

2.      **Even if a Traffic Stop Had Occurred, Deputy An Had "Reasonable Suspicion" to Investigate.**

The government also makes the alternative argument that even if Deputy An's encounter with Reynolds in the intersection amounted to a "traffic stop" or "seizure," there was reasonable suspicion to justify an investigative stop. Reynolds relies on Deputy An's characterization at the preliminary/detention hearing of his decision to investigate the Corsica as a "hunch" to argue that there was not reasonable suspicion for the deputy's actions. The government has the better argument.

8

Under Terry v. Ohio, 392 U.S. 1 (1968), the police may briefly stop and detain persons in order to investigate a reasonable suspicion that those persons are involved in criminal activity, even in the absence of probable cause to believe that a crime has been committed. United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990). Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). Although the "reasonable suspicion" required for a Terry stop is less stringent than the requirement for probable cause, United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996), "reasonable suspicion" does require that an officer have more than a "hunch" that criminal conduct is afoot based on unparticularized facts. The officer must be able to articulate some minimal, objective justification for the investigatory detention. United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004); United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989).

Although Deputy An referred to relying on a "hunch" to guide his decision to make his failed attempt to stop the Corsica and its passengers, the deputy's "hunch" was supported by known facts that created reasonable suspicion to investigate. Deputy An knew the color and type of vehicle that was used in a bank robbery that occurred approximately five to ten minutes earlier. He also knew that dispatch was reporting that a civilian was following the Corsica and reporting its location and the direction it was heading. Deputy An was at the intersection where dispatch had reported the getaway car to be approaching. Unlike the case

relied upon by Reynolds, where officers only knew the color and general area where the car may have been, United States v. Jaquez, 421 F.3d 338, 341 (5th Cir. 2005) (*per curiam*), in this case, the deputy knew the color, type, and virtually the exact location of the suspect car, including the direction in which the car was heading.  Cases in the Eleventh Circuit have affirmed Terry stops based on descriptions that contained details similar to those known by Deputy An.  United States v. Aldridge, 719 F.2d 368, 370 (11th Cir. 1983) (large, white automobile, possibly a General Motors or Chrysler product, with a broken tail light); United States v. Osborne, 630 F.2d 374, 378 (5th Cir. 1980) (older model, yellow station wagon driven by white male (fitting broadcast description)); United States v. Hall, 557 F.2d 1114, 1117 (5th Cir. 1977) (red, 1969 Ford with light complexioned black driver (fitting broadcast description) proceeding from area of robbery within twenty minutes after the crime).

In sum, even if Deputy An had successfully stopped the Corsica and seized its passengers for an investigative stop, there is no basis for concluding that a Fourth Amendment violation occurred.  Deputy An's "hunch" was well supported by objectively identifiable facts that justified an investigative stop.[11]

**B.      Legality of the Show-Up Identification**

Reynolds next argues for suppression of all pre-trial identification testimony related to the show-up conducted at Queensboro National Bank on April 21, 2006, in which he was identified by bank employees as one of the robbers.  Specifically, Reynolds argues that

---

[11]The Court acknowledges, but need not discuss in detail because of the foregoing analysis, the government argument that once Reynolds shot at Deputy An, he was subject to arrest.  Then, the evidence in the Corsica was subject to seizure pursuant to a lawful arrest. See New York v. Belton, 453 U.S. 454, 460 (1981).

because he was brought to the bank in a police vehicle and presented to the witnesses while handcuffed and accompanied by law enforcement personnel, the process was impermissibly suggestive and therefore violated his due process rights. Reynolds also contends that because of the suggestive nature of the show-up, and based upon a review of the discovery, including witness interviews, there is a substantial risk that he was misidentified by the victim-witnesses. The government counters that the show-up was not impermissibly suggestive, and accordingly, whether Reynolds was correctly identified by bank employees is not an issue for pre-trial resolution. The government has the better argument.

The Eleventh Circuit requires a two-step analysis to determine whether an identification process is so unreliable as to violate due process. Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987).

> We must first decide whether the original identification procedure was unduly suggestive. If not, that ends the inquiry. If so, however, we must then determine whether the suggestive procedure, given the totality of the circumstances, created a substantial risk of irreparable misidentification at trial. Dobbs v. Kemp, 790 F.2d 1499, 1506 (11th Cir. 1986), *modified in part on other grounds*, 809 F.2d 750 (11th Cir. 1987); Passman v. Blackburn, 652 F.2d 559, 569 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 1022, 102 S. Ct. 1722, 72 L. Ed.2d 141 (1982). Under this analysis, "reliability is the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253, 53 L. Ed.2d 140 (1977).

Id. (emphasis added) (footnote omitted). The factors that go into the "totality of the circumstances" analysis include: "the opportunity to view, the degree of attention, the accuracy of the description, the level of certainty, and the length of time elapsing between the crime and the identification." Blanco v. Singletary, 943 F.2d 1477, 1508 (11th Cir. 1991) (citing Neil v. Biggers, 409 U.S. 188, 199 (1972)).

11

In a case with facts analogous to those now before the Court, the Eleventh Circuit recognized that show-ups have been widely condemned, but the court also noted that "immediate confrontations allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons." Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987) (*per curiam*). In Johnson, an eyewitness to a bank robbery was taken to the location where two suspects had been apprehended; the witness viewed the suspects from seven to ten feet away while they were in the back of a police car. Id. at 728-29. Although the witness identified the two men as the robbers when they were sitting in the back of the police car, he could no longer recognize them at the suppression hearing. Id. at 729. The Eleventh Circuit affirmed the trial court's decision to suppress any in-court identification by the witness but denied the motion to suppress the out-of-court identification. Id. The court noted that the police had not aggravated the suggestiveness, and as the witness had a good opportunity to observe the defendants in broad daylight, both before and after they entered the bank, had thoroughly described them to the police, was certain of the identification at the time, and had identified them only minutes after the crime while his memory was still fresh, the identification was sufficiently reliable. Id.

In this case, defense counsel subpoenaed three bank employees who participated in the challenged show-up to testify about the manner in which it was conducted. Prior to taking any testimony at the hearing, the government and defense counsel argued extensively about the propriety of requiring the employees to testify. Relying heavily on Johnson v. Dugger, *supra*, and the two-step, due process analysis to be used when considering the

12

appropriateness of an identification process, the government vigorously objected to the bank employees having to testify about their identification of Reynolds before Reynolds cleared the first hurdle of showing that the show-up was unduly suggestive. Defense counsel countered that Reynolds should have the opportunity to present witness testimony about how the show-up was conducted in an effort to undermine the government's version of what actions were taken.

The Court is aware that a defendant should be given "wide latitude to develop the factual circumstances" about the suggestiveness of an identification procedure. United States v. Williams, 592 F.2d 1277, 1281 (5th Cir. 1979) (remanding case to trial court where defense counsel not allowed to present evidence on suggestiveness of identification process). However, here, there is nothing to suggest that Reynolds had any evidence to offer at the December 20th hearing that would change the conclusion that the show-up was not unduly suggestive. When specifically given the chance to tell the Court what evidence he had in support of his argument concerning the suggestiveness of the show-up, defense counsel explained that he had interviewed bank employees who stated that a law enforcement officer inside the bank (as opposed to standing outside with Deputy An) told them that there was somebody that they wanted the employees to look at for identification purposes and that Reynolds was told to hold his head up and open his mouth. The Court ruled that it would hear from Deputy An about the show-up procedure and then decide whether the bank employees would be allowed to testify about the show-up procedure.

Upon hearing Deputy An's testimony that within approximately one hour of the bank robbery, Reynolds was removed from the back of Deputy An's vehicle and displayed to the

employees, approximately fifteen to twenty feet away, in handcuffs and in the same clothes that he had been wearing when he was arrested, the Court determined that Reynolds had not cleared the initial hurdle of showing that the show-up procedure was unduly suggestive, and the bank employees were not permitted to testify. However, even assuming that the bank employees had testified to the information outlined by defense counsel at the hearing, this would not change the conclusion that there was nothing unduly suggestive about the manner in which the show-up was conducted. An announcement by officers to the bank employees that there was somebody to look at for identification purposes would serve as a simple explanation as to what was about to occur, and a request to a suspect to hold up his head is neither unusual nor aggravating to the process. As to the request for Reynolds to open his mouth, the government explained that the witnesses had noted the robber's teeth as an identifying feature, and thus, there is nothing unduly suggestive about asking to see Reynolds's teeth.[12]

---

[12]Also, as noted, *supra*, at the preliminary/detention hearing, the Court heard testimony from Special Agent Beach about the distinctive nature of Reynolds's teeth and that his teeth were a notable feature both to Special Agent Beach and the bank employees "when [Reynolds] opened his mouth." (Doc. no. 72, p. 12). Special Agent Beach also testified that he thought Reynolds was asked to smile. (Id. at 26). Thus, even though the bank employees did not testify at the December 20th hearing, the Court had previously heard testimony about what may have occurred inside the bank during the show-up procedure. Nevertheless, as set forth above, there is nothing unduly suggestive about asking Reynolds to open his mouth or to smile - particularly when the robber's teeth were identified as a distinctive feature. Nor is the possibility that Reynolds was asked to open his mouth and/or smile reason to discredit Deputy An's testimony that he did not direct Reynolds to take any specific actions because the evidence of record is that there were numerous other law enforcement officers on the scene, any one of whom may have asked or directed Reynolds to open his mouth and/or smile. Deputy An was asked at the December 20th hearing whether he directed Reynolds to take any particular actions, not whether anyone else on the scene may have done so.

Moreover, as the Court explained, defense counsel will have ample opportunity for cross-examination at trial to challenge the reliability of the identification. Cf. Simmons v. United States, 390 U.S. 377, 384 (1968) (noting that danger of misidentification by eyewitnesses in pre-trial identification procedures may be "substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error"). Indeed, defense counsel acknowledged that he has interviewed the bank employees and knows what information they have to offer about the identification process; therefore, at trial, he can use that information to prepare any challenge to identification testimony that he deems to be appropriate. In addition, a jury charge on the reliability of witness identifications can also be offered, thereby again informing jurors of their role as the fact-finders on whether Reynolds is the bank robber. As Reynolds failed to identify any way in which the show-up was unduly suggestive, whether the bank employees correctly identified Reynolds as the bank robber is simply not a matter for pre-trial resolution.

In sum, there is no basis for recommending suppression of all pre-trial identification testimony related to the challenged show-up procedure.

### III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Defendant Reynolds's motions to suppress be **DENIED** (doc. nos. 45, 74) and that Defendant's Price's motion to suppress be **DENIED** as **MOOT** (doc. no. 48).

SO REPORTED and RECOMMENDED this 10th day of January, 2007, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

15

# United States District Court
## *Southern District of Georgia*

UNITED STATES OF AMERICA      \*

            vs.             \*      CASE NO.  1:06-cr-81

ALVIN L. PRICE and DONALD M.      \*

REYNOLDS      \*

     \*

The undersigned, a regularly appointed and qualified deputy in the office of this Clerk of this District, while conducting the business of the Court for said Division does hereby certify the following:

     1.      Pursuant to instructions from the court, and in the performance of my official duties, I personally placed in the U.S. Mail a sealed envelope bearing the lawful frank of the Court, and properly addressed to each of the persons, parties or attorneys listed below;
            and

     2.      That the aforementioned envelope(s) contain a copy of the documents known as Rpt/Recomm _____ dated 1/10/07 _____ , which is part of the official records of this case.

Date of Mailing:      1/10/07 _____

Date of Certificate:      1/10/07 _____

                            SCOTT L. POFF, CLERK

                            By *L. Flkrder* _____
                            :

NAME:

1. Alvin Price
2. Donald M. Reynolds
3. Davis A Dunaway
4. Daniel Gregory Leopard
5. _____
6. _____
7. _____

| Cert/Copy | | | Cert/Copy | | |
|---|---|---|---|---|---|
| ☐ | ☐ | District Judge | ☐ | ☐ | Dept. of Justice |
| ☐ | ☒ | Magistrate Judge | ☐ | ☐ | Dept. of Public Safety |
| ☐ | ☐ | Minutes | ☐ | ☐ | Voter Registrar |
| ☐ | ☐ | U.S. Probation | ☐ | ☐ | U.S. Court of Appeals |
| ☐ | ☐ | U.S. Marshal | ☐ | ☐ | Nicole/Debbie |
| ☐ | ☒ | U.S. Attorney | ☐ | ☐ | Ray Stalvey |
| ☐ | ☐ | JAG Office | ☐ | ☐ | Cindy Reynolds |